Zellie Darrow v. William L. Pierce.

*Evidence—Loss of paper—Parol proof of contents—Trial—Conduct of circuit judge.*

1. The loss of a paper, which the witness says he left with another party, is not sufficiently shown to warrant parol proof of its contents, by his testifying that he has searched for and been unable to find the paper, but not stating in what particular place or places the search was made, or that he asked the custodian where the paper was, and no effort having been made to secure the testimony of the custodian, whose home was at the same town, in another state, as that of the witness.

2. The action of the circuit judge in taking partial control of the examination of a witness, and finally abruptly dismissing him without the consent of counsel, is held to have been prejudicial error.

Error to Gogebic. (Williams, J.) Argued March 11, 1892. Decided March 18, 1892.

Replevin. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Button & Norris,* for appellant.

*M. H. Crocker,* for defendant.

MORSE, C. J.    Plaintiff brought replevin in the Gogebic circuit court for the recovery of two horses, a heavy wagon, one double harness, two pair bob-sleighs, one platform scale, and other property. The officer who served the writ was unable to find the horses, wagon, and harness. Afterwards they were found in Wisconsin, and a suit in replevin was commenced in that state for their possession.

Plaintiff claimed the property taken on the writ in the case now here by purchase. It appears without dispute that the property at one time belonged to the Conover Meat & Provision Company, doing business at Ironwood, Mich., and Hurley, Wis., the defendant being a member of the company. He sold out his interest in the business and the property in question in this suit, as well as that in the Wisconsin replevin suit, to Otto Karste and James Mead. January 29, 1887, he rebought the entire business and property, giving in part payment therefor a mortgage on such property to Mead. Defendant then took in a partner by the name of Stevens, using the property in question until some time in April, 1887, when they took in another partner, Frank E. Field. The business was then conducted in the name of Field, Stevens & Co. until July, 1887, when defendant left the firm. Field and Stevens continued the business, using the property and having exclusive possession of it. During the existence of the firm of Field, Stevens & Co. an inventory of the property belonging to the firm was made, at which plaintiff assisted, he then being in the

employ of the firm. When defendant went out of the firm, a dissolution of the partnership was executed in writing by the parties, in which it was provided:

"All the property and assets of said firm, of every name and nature, is hereby conveyed and transferred to said Frank E. Field and Frank Stevens, to be by them sold, disposed of, or collected, as the case may be, and the proceeds thereof, net, applied by them towards the payment of the present debts of said firm, and they hereby agree to dispose of such property and collect the accounts owing to the firm, and apply the net proceeds towards the payment of such debts. If any balance of such net proceeds shall remain after the full payment of such debts, then one-third of such net proceeds shall be by them paid to said Wm. L. Pierce for his use."

It was claimed by plaintiff that the property involved in the two replevin suits, and mentioned in the writ in this case, was part of said inventory and partnership property; and that Stevens sold it to Field, and Field then sold it to plaintiff and one Robinson, who transferred his interest to plaintiff, the property going with the business at each sale, and remaining always in the possession of those who were carrying on such business. Darrow left the property with his brother, and on or about the 1st day of October, 1887, it was unlawfully taken by the defendant. The defendant admits the possession, as claimed by the plaintiff, but denies that the property ever passed by sale from him to Field, or to any other person or persons, and denies that it ever became the partnership property of Field, Stevens & Co. He testified that Stevens & Co. expected to buy this property of him, but never did.

"They used the property with my consent, and it was to be paid for out of the business; but I never received any money for them, never sold them, and Mr. Field or Mr. Stevens never made any pretense to me that I had sold the property to them. They never paid any rent

for them. They used the property but a short time, and it was then turned over to Darrow [plaintiff]. Darrow paid me $90 for rent of this property."

The plaintiff called as a witness one John Kelly, who testified that he lived at Hurley, Wis., and had been employed by the firm of Field, Stevens & Co. as book-keeper; that he helped to make an inventory of the part-nership property of that firm May 22, 1887; that he did not know where such inventory was; that it was in his possession until the latter part of April, 1888, when he left it with Stevens, who lives at Hurley. When witness went after it, he could not find it.

"*Q.* How much of a search did you make for it?

"*A.* Well, I saw the book was gone, and I made up my mind that it was gone for a purpose.

"*The Court:* We do not want any of your opinions. State what you did.

"*Q.* Whether or not you looked in every place where the book might possibly be around the premises?

"*A.* Yes, sir; I made search around the premises.

"*Q.* You were unable to find the book?

"*A.* Yes, sir."

On cross-examination he further testified:

"*Q.* You left the inventory with Mr. Stevens?

"*A.* Yes, sir.

"*Q.* Some time after that you went after it, and you say it was not to be found?

"*A.* No, sir.

"*Q.* Where did you search for it?

"*A.* I searched for it there.

"*Q.* That is all you did in regard to trying to find it?

"*A.* Yes, sir.

"*Q.* You have seen Mr. Stevens a good may times since then, haven't you?

"*A.* Yes, sir.

"*Q.* You have seen him in this State and in Wiscon-sin?

"*A.* Yes, sir.

"*Q*. He could be found almost at any time in this State, couldn't he?

"*A*. Yes, sir.

"*Q*. If. you wanted to subpœna him he could be found here?

"*A*. Yes, sir."

It was then offered to show by Kelly the contents of this inventory. It was objected to on the ground that a sufficient search had not been made, and that no effort had been made to obtain Stevens as a witness. The court sustained the objection, and we think properly. It was not shown in what particular place or places the witness made this search, or that he asked Stevens for it, or inquired of him where it was. Some effort should have been made to learn from Stevens, who had the custody of it, its whereabouts, or to have procured the testimony of Stevens, before parol proof was offered as to what property was described in this inventory. It is true, Stevens lived in Wisconsin, but he resided at the same place as Kelly, and no reason was shown why his testimony could not have been obtained as easily as Kelly's.

We are satisfied, however, that the plaintiff did not have a fair trial, and that his case was prejudiced by the conduct of the circuit judge upon the trial. Upon the examination of plaintiff's principal witness, Kelly, the court became extremely technical, confining the plaintiff's counsel in his questions to narrow limits, and often interrupting the witness with objections to his answers. The circuit judge also took the examination of the witness at times, and would' then in many cases stop the witness before the answer was completed. `This course of proceeding finally culminated, while plaintiff's counsel was examining the witness, in the court saying abruptly to Kelly:

"Witness, we don't want you any longer; leave the stand."

Upon the plaintiff's counsel objecting to this dismissal of the witness, the court said:

"You are asking immaterial questions. He has stated all he knows about the title to this property, and that is all that is involved here. I am not going to stay here any longer, and have a witness asked questions for the mere purpose of taking up time."

The court, as shown by the record, had taken nearly, if not quite, as much time as plaintiff's counsel in the examination of this witness; and at the time the witness was dismissed the counsel was endeavoring to show that the title to the property in the Wisconsin suit was acknowledged by defendant to be the same as that involved in this suit, and what the testimony of defendant was in relation to the title to such property in the Wisconsin suit. This testimony was material, as was afterwards acknowledged by the circuit judge. The only excuse that could be offered for this treatment of the witness and counsel was made by the circuit judge on the opening of court on the next day, when he said that he was not in good temper the day before. He then permitted plaintiff's counsel to introduce testimony as to what defendant had sworn to in the Wisconsin suit, and suggested that the stenographer's copy be read, which was done.

We are not satisfied that this cured the error. It is claimed by plaintiff's counsel that the conduct of the circuit judge made him nervous and embarrassed, so that he was unable to fairly and fully present his evidence, and that the witness Kelly was also so confused and embarrassed that he was unable to clearly state the full facts within his knowledge. A careful reading of the record shows that this claim is apparently well founded,

and that the hampering of counsel and witness, and the abrupt dismissal of the latter from the stand, were well calculated to prejudice the plaintiff's case with the jury.

The judgment is reversed, and a new trial granted, with costs of this Court to plaintiff.

The other Justices concurred.